**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HILARY STEADMAN and KRISTIN HERBECK, on behalf of themselves and all others similarly situated.<br><br>Plaintiffs,<br><br>-against-<br><br>THE CITY OF NEW YORK;; NYPD DETECTIVE CRAIG JACOB (TAX REG. NO. 935049); NYPD OFFICER MICHAEL GUARDINO (TAX REG. NO. 953934); NYPD OFFICER JOSEPH WOZNIAK (TAX REG. NO. 970326); NYPD LIEUTENANT JOHN KALOUDIS (TAX REG. NO. 928571); NYPD MEMBER CANDICE RICHARDS (Shield No. 8120); NYPD OFFICER ERMIR ALIAJ (TAX REG. NO. 959452); NYPD OFFICER DENNIS PENG (TAX REG. NO. 962674); NYPD SERGEANT JASON PORTEE (TAX REG. NO. 945283), AND NYPD MEMBER DOES 1-3, | Case No. 25-cv-4081<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Hilary Steadman and Kristin Herbeck, on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, allege as follows:

**PRELIMINARY STATEMENT**

1. On April 30, 2024, Plaintiffs were participating in a protest against Israel's genocide of Palestinians in Gaza when police violently assaulted them, arrested them, and later falsely and maliciously prosecuted them. This lawsuit seeks justice for and accountability around the City of New York's – and its police force's – retaliatory, disproportionate, and unreasonable response to that protest and to First Amendment Activities. On the heels of a settlement promising sweeping changes to police tactics related to policing demonstrations arising from the use of excessive force and other abusive tactics during the Black Lives Matter protests in the summer of 2020 and in 2021,  the NYPD has continued to engage in actions related to policing pro-Palestine demonstrations such as the one at which Plaintiffs were arrested, violating Plaintiffs'

1

constitutional and other rights.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

3.      The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

4.      The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief they pray for herein.

5.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

6.      The Court has supplemental jurisdiction over the state and City law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as Defendant City of New York resides in this district, and Plaintiff Steadman resides in this district.

## PARTIES

8.      At all times mentioned herein, Plaintiff Hilary Steadman is and has been a resident of Kings County and the State of New York.

9.      At all times mentioned herein, Plaintiff Kristin Herbeck is and has been a resident of Queens County and the State of New York.

10.      At all relevant times mentioned herein, Defendant, City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by the

2

virtue of the laws of the State of New York and acts by and through its agencies, employees, and agents, including (but not limited to) the New York City Police Department ("NYPD") and their employees.

11. Defendant NYPD Officer CRAIG JACOB, Tax ID# 935049, was at all times relevant to this Complaint a Detective with the NYPD assigned to the Strategic Response Group 1. He is sued individually and in his official capacity.

12. Defendant NYPD Officer Michael Guardino (Tax Reg. No. 953934) was at all times relevant to this Complaint an Officer with the NYPD assigned to the Strategic Response Group 1. He is sued in his official and individual capacities.

13. Defendant NYPD Officer Joseph Wozniak (Tax. Reg. 970326) was at all times relevant to this Complaint an Officer with the NYPD assigned to the Strategic Response Group 1. He is sued in his official and individual capacities.

14. Defendant NYPD Lieutenant John Kaloudis (Tax Reg. No. 928571) was at all times relevant to this Complaint and Officer with the NYPD assigned to the Strategic Response Group 1. He is sued in his official and individual capacities.

15. Defendant NYPD Member Candice Richards (Shield No. 8120) was at all times a member of the NYPD assigned to Police Service Area 3. She is sued individually and in her official capacity.

16. Defendant NYPD Officer Ermir Aliaj (Tax Reg. No. 959452) was at all times a member of the NYPD assigned to Strategic Response Group 1. He is sued in his official and individual capacities.

17. Defendant NYPD Officer Dennis Peng (Tax Reg. No. 962674) was at all times a member of the NYPD assigned to Strategic Response Group 4. He is sued in his official and

3

individual capacities.

18.    Defendant NYPD Sergeant Jason Portee (Tax Reg. No. 945283) was at all times a member of the NYPD assigned to Strategic Response Group 5. He is sued in his official and individual capacities.

19.    NYPD Member Does 1 -3 are at all times members of the NYPD who participated in and supervised the violations described herein. The Doe Defendants are sued herein in their official and individual capacities.

20.    At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD.

21.    At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

22.    Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

23.    Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

24.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

25. At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

26. Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no point did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

27. Each individual Defendant is sued in her or his individual and official capacities.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW[1]

28. Plaintiff Kristin Herbeck served a Notice of Claim upon the City of New York within the statutory time.

29. Plaintiff Herbeck attended a hearing pursuant to section 50-h of the New York General Municipal Law on January 30, 2025.

30. More than thirty days have elapsed since Plaintiff Herbeck served a Notice of Claim and the City has not offered adjustment or payment thereof.

## STATEMENT OF FACTS

31. On April 30, 2024, Plaintiffs and members of the proposed class all attended a protest just outside the City College of New York in Harlem.

32. Days prior, CUNY students, faculty, and community members had set up an encampment at CCNY calling for the college to divest funds from Israel.

33. The facts detailed below happened mostly on the stretch of Amsterdam Avenue

---

[1] Plaintiff Herbeck complied with the notice of claim provisions of the Gen. Mun. L., but compliance was not necessary because this case is "a class action brought to protect civil rights." *Coggins v County of Nassau*, 988 F Supp 2d 231, 251 (EDNY 2013).

between 135th St. and 138th St., on the sidewalk outside the gate to the campus.

34.    NYPD also cleared out the encampment on campus.

35.    However, that course of conduct is not the subject of the claims here — Plaintiffs and the Class were outside the campus, protesting in support of those inside.

36.    Plaintiffs and the Class were expressing support, within sight and sound of their target, without interfering with any legitimate government function.

37.    Despite a total lack of probable cause, the police surrounded the protesters outside the campus, and then brutally assaulted them.[2]

38.    NYPD used this tactic — "kettling" colloquially, "encirclement" formally — despite a consent decree barring its use. *See* Stipulated Order, *In Re:  New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924, ¶ 68[3] ("Consent Decree").

39.    With protesters surrounded, there was no ability for protesters to leave or comply with any order to disperse (if one was even given).

40.    Once protesters were surrounded, members of the NYPD began using force on protesters.

41.    Members of the NYPD also began mass arrests, arresting at least 170 people from CCNY generally.

42.    Upon information and belief, there were only 22 arrests from *inside* the building/encampment.

43.    Therefore, NYPD arrested at least 148 people who were protesting the sweep of the encampment (but not themselves engaged in any arrestable conduct).

---

[2] *See, e.g.*, Leon Orlov-Sullivan, <u>NYPD shuts down CUNY Gaza Solidarity Encampment at City College</u>, theCAMPUS (May 1, 2024).

[3] The Court entered the order in a memorandum decision.  The actual text of the consent decree can be found at <u>ECF No. 1128-1</u>.  The order entering the consent decree is at <u>ECF No. 1147</u>.

**Ms. Steadman's Arrest and Assault.**

44.    On April 30, 2024, Ms. Steadman and her partner joined a protest near 139th Street and Amsterdam Avenue in Harlem, outside the gates of the City College of New York ("CCNY").

45.    Ms. Steadman and her partner were on the sidewalk and listening to speeches when NYPD officers began kettling protestors.

46.    The officers surrounded Ms. Steadman along with dozens of other protestors and kettled them into the area of CCNY.

47.    Before Officers could close in on everyone, Ms. Steadman left out of the encirclement.

48.    NYPD officers created a semi-circle formation around protest on 139th street and Amsterdam and closed in on protests until they were up against the CCNY gates including Ms. Steadman.

49.    Ms. Steadman was able to slip out of the encirclement.

50.    Ms. Steadman witnessed an NYPD officer assault a woman and arrest her.

51.    Ms. Steadman began recording the assault and followed the woman as an officer led her away.

52.    That officer turned around and told Ms. Steadman to back up and go somewhere else.

53.    Ms. Steadman immediately began walking away, in compliance with the officer's command.

54.    Suddenly, Defendant Detective Jacob charged towards Ms. Steadman with his baton.

7

55. Defendant Jacob yelled for Ms. Steadman to get out of the street and simultaneously grabbed Ms. Steadman and pushed her into a nearby NYPD truck, without giving her any opportunity to hear what he said, let alone comply.

56. Defendant Detective Craig Jacob of the SRG 1—with 18 CCRB complaints, 6 of which are for force—slammed Ms. Steadman's body into a NYPD truck that was parked on the street.

57. Defendant NYPD Officer Michael Guardino, Defendant NYPD Officer Joseph Wozniak, Defendant NYPD Detective Jacob, and/or Defendant NYPD Lieutenant John Kaloudis, continued to ram Ms. Steadman into the truck while Defendant Jacob beat Plaintiff with his baton.

58. Defendant Jacob then threw Ms. Steadman onto the ground and put his knee on her chest while one of Defendants Guardino, Wozniak, and/or Kaloudis held her feet.

59. A National Lawyers Guild – New York City Chapter Legal Observers approached Ms. Steadman to document the arrest and was pushed in the chest and onto the ground by Defendant Jacob.

60. Several NYPD officers swarmed Ms. Steadman and held her hands and body down.

61. Defendant Jacob then flipped Ms. Steadman on to her stomach and pressed his knee into her neck.

62. Defendants Guardino, Wozniak, and Kaloudis beat Ms. Steadman with a baton about her body.

63. Frightened she may be choked to death, Ms. Steadman struggled to breath and yelled to the officers that she could not breathe.

64. In response, an NYPD officer said "you can breathe" while maintaining the full

8

weight of his body on Ms. Steadman's neck.

65.    While Ms. Steadman was on the ground yelling that she could not breathe, several other officers surrounded Ms. Steadman and the officers assaulting and arresting Ms. Steadman.

66.    Upon information and belief, this was to prevent media, legal observers, or anyone else attempting to document the conduct from witnessing the arrest and assault.

67.    Defendants placed Ms. Steadman in metal cuffs and tightened them.

68.    Defendants then aggressively snatched Ms. Steadman off of the ground.

69.    While marching Ms. Steadman to a NYPD van, Defendant Jacob repeatedly tightened the metal handcuffs.

70.    Each time Ms. Steadman complained to Defendant Jacob that the cuffs were too tight, he would shove her and further tighten the handcuffs.

71.    Ms. Steadman pleaded with Defendant Jacoband other officers around them to loosen the cuffs.

72.    It was not until several hours later, after Ms. Steadman's hands went numb, that the cuffs were loosened.

73.    Ms. Steadman was held in custody for approximately 12 hours and was issued a desk appearance ticket for obstruction of governmental administration.

74.    Defendant Jacob then made false allegations in official documents accusing Ms. Steadman of standing in the roadway with a large crowd of approximately 300 people, chanting, yelling and screaming while standing next to an available sidewalk.

75.    Defendant Jacob also falsely claimed to have observed NYPD Personnel, via LRAD, direct Ms. Steadman to exit the street and alleged Ms. Steadman refused.

76.    Defendant Jacob also falsely accused Ms. Steadman of resisting arrest.

77.    The District Attorney's office of New York declined to prosecute the charge resolving the matter in Ms. Steadman's favor.

78.    As a result of Defendants' actions, Ms. Steadman suffered severe bruising, lacerations and swelling about her body that left them in pain for several weeks. Ms. Steadman suffered bodily injury, pain, suffering, psychological and/or emotional damages.

**Ms. Herbeck's Arrest and Assault.**

79.    On April 30, 2024, Ms. Herbeck joined a protest, with a friend, near 139th Street and Amsterdam Avenue in Harlem, outside the gates of the City College of New York ("CCNY").

80.    At the relevant time, Plaintiff Herbeck and her friend were outside CCNY, protesting the NYPD's sweep of the encampment, along with a large group of protesters.

81.    Police began to kettle/encircle protesters in front of the CCNY gate.

82.    Plaintiff Herbeck and the others were surrounded on all sides.

83.    Plaintiff Herbeck and the others had no ability to leave.

84.    Plaintiff Herbeck was not given an instruction to leave and opportunity to comply therewith.

85.    Members of the NYPD then grabbed Ms. Herbeck's friend and pushed them headfirst into the concrete.

86.    Ms. Herbeck tried to check on her friend.

87.    When she did so, Defendant NYPD Officer Candice Richards, Defendant NYPD Officer Ermir Aliaj, Defendant NYPD Officer Dennis Peng, and Defendant NYPD Sergeant Jason Portee grabbed Ms. Herbeck from multiple directions.

88.    Defendants Richards, Aliaj, Peng, and Portee pulled her violently in opposing

10

directions.

89.    Defendants Richards, Aliaj, Peng, and Portee, in keeping with common NYPD practice, yelled "stop resisting" despite the fact that Ms. Herbeck was not resisting.

90.    Ms. Herbeck was then subjected to Defendants' protest arrest practices (detailed elsewhere herein).

91.    While in custody, officers mocked and used repeated abusive language with protesters, harassing them on the basis of their speech.

92.    Ms. Herbeck was released at approximately 5:00 a.m. the next day.

93.    Ms. Herbeck was given a Summons sworn out by Defendant Richards, alleging "Disorderly Conduct."

94.    Defendant Richards' allegation was false, was known to be false when it was made, and was likely to impact a prosecutor's decisions.

95.    Those charges were dismissed and sealed on or about May 20, 2024, on grounds consistent with innocence.

## THE CITY'S OFFICIAL POLICY OF OPPOSING PRO-PALESTINIAN DEMONSTRATIONS

96.    New York City's Mayor Eric Adams has made his disdain for pro-Palestine protests well-known. Mayor Adams has, at various times, referred to peaceful marchers and protestors as "supporters of terrorists", "outside" and "professional agitators", "extremists."

97.    That has translated into official action.

98.    For example, for nearly ten years, the community in Bay Ridge, Brooklyn — where New York City's substantial Palestinian population is centered — has commemorated Nakba Day, the anniversary of the 1948 violent expulsion of the vast majority of Palestinians living in the territory that would become the State of Israel.

99.     This commemoration has typically included an annual march and protest, which has always been peaceful.

100.    Families would often bring their children and gather for this commemoration in years' past.

101.    For Nakba Day on May 18, 2024, the New York City Police Department ("NYPD") amassed an unprecedented number of officers in Bay Ridge for this day preemptively, and sent Depart of Corrections buses in advance.

102.    Instead of allowing a peaceful protest to take place, the NYPD unleashed an unprecedented level of violence and brutality against Nakba Day protestors, because of the City's official policy of attempting to quash their message.

103.    On several occasions, NYPD members brutally attacked members of the crowd with reckless abandon. NYPD members caused severe injuries to many protestors, including some that will alter people's lives.

104.    Among other things, these actions caused concussions, life-altering brain injuries, broken bones, lacerations, hematomas, nerve damage, and psychological injuries, some of which make be long-term or permanent.

105.    The City has also ratified that conduct.

106.    Mayor Adams is on the record praising the NYPD's behavior during the Nakba Day protest, calling it "commendable."

107.    Then-Deputy Commissioner Kaz Daughtry has also spoken positively the NYPD's conduct at Nakba Day.

108.    The NYPD's behavior during pro-Palestine protests has been personally directed by the leadership of the NYPD, such as NYPD Chief of Patrol John Chell and Deputy

Commissioner Kaz Daughtry.

## THE NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE AND OTHER, SIMILAR DEMONSTRATIONS

109.    The NYPD's violent response to the pro-Palestine protest that the plaintiffs participated in was dramatically different from their response to other kinds of protests and rallies.

110.    On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[4]

111.    On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[5]

112.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police

---

[4] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights

[5] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge

said that no arrests or summons were issued to the protestors on the night of the rally.[6]

113.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[7]

114.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her, and police threw her to the ground.[8]

115.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[9]

116.    Individuals associated with the Red Rose Rescue, a group identified by the New York State Attorney General as a "Militant Anti-Abortion Group" that invades clinics and blocks access to reproductive health, also routinely march and protest in NYC. However, the NYPD often treats this group more favorably, including snot making arrests and not using excessive

---

[6] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[7] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

[8] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[9] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused- covid-19-measures-n1249873

force, while arresting and using excessive force against people protesting for Palestine.

117.     The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.  By way of non-exhaustive example:

    a.  In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

    b.  In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[10] [11]

    c.  More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[12] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[13]

### REPORTS AND INVESTIGATIONS INTO THE 2020 PROTESTS

118.     In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests during the

---

[10] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson
[11] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/
[12] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video
[13] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

summer of 2020 ("AG Report").[14]

119.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

120.    The AG Report also found the pervasive use and misuse of tightly fastened flex-cuffs during arrests and NYPD officers covering their badge numbers.

121.    In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[15]

122.    The DOI Report found, inter alia, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[16]

123.    In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests.[17]

124.    The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders

---

[14] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiffs herein incorporate by reference into this case the facts set forth in the AG Report.

[15] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[16] *Id.* at 36.

[17] *Id.* at 61.

and riots from those applicable to peaceful First Amendment expression.

125.    The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

126.    The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

127.    According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[18]

128.    The DOI also found that Black arrestees were disproportionately charged with felonies.[19]

129.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[20]

130.    According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[21]

131.    In September of 2020, Human Rights Watch issued a detailed analysis of the Mott Haven protest (the "HRW Report") describing the preplanned and coordinated disruption of the march by the NYPD, including by Chief Monahan, who was present at the NYPD mobilization.[22]

132.    The HRW Report describes the systematic kettling of protesters in Mott Haven before the 8:00 p.m. curfew and the subsequent excessive force and mass arrest of the marchers,

---

[18] *Id.* at 26.
[19] *Id.* at 27.
[20] DOI Report at 56.
[21] *Id.* at 28.
[22] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

including National Lawyers Guild – New York City Chapter Legal Observers, as well as medics, all of whom were classified as essential workers exempt from the Mayor's Curfew Orders.

133.    Notwithstanding these reports condemning the conduct of the NYPD, following the Mott Haven protest, then-Commissioner Shea ratified the misconduct that occurred when he said the mobilization by the NYPD in Mott Haven was "executed nearly flawlessly."[23]

134.    The City's own Law Department issued a similar report (the "OCC Report").[24]

135.    As noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[25]

136.    As the City's *own lawyers* reported, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[26]

137.    Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

138.    Notwithstanding the above, and notwithstanding the Consent Decree mentioned elsewhere herein, the NYPD continued applying the same policies and practices identified as unconstitutional and problematic by these extensive reports.

---

[23] Jake Offenhartz, Nick Pinto, and Gwynne Hogan, "NYPD's Ambush of Peaceful Bronx Protesters Was "Executed Nearly Flawlessly," City Leaders Agree, Gothamist, June 5, 2020, available at *https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree.*

[24] New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

[25] OCC Report at 37.

[26] OCC Report at 2, 30.

139.    As the City's own lawyers highlight, that was to be expected:  The City has a longstanding policy and practice of not learning from critiques of its police.

**THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS**

140.    The extensive deprivations of constitutional rights suffered by Plaintiffs here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, inter alia, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

141.    The NYPD response to the pro-Palestine protest on April 30, 2024 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

142.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, and use of pepper spray.[27]

143.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests, and excessive and unreasonable detention.[28]

---

[27] *See,* e.g., N.Y. Civil Liberties Union, Arresting Protest (2003), available at https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[28] *See,* e.g., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

144.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[29]

145.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers.[30]

146.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, pro-Palestine and other, similar protests, over the intervening years.

147.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiffs in this case.

148.    In many of these cases Defendants employed tactics developed and modified over the course of many years by former Commissioner Shea, former Chief Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases, the most recent of which was filed in January of this year:

      a.    *Moussa et al. v. City of New York,* 1:25-cv-00442 (S.D.N.Y. March 15, 2025) (lawsuit arising from October 21, 2023 pro-Palestine alleging, *inter alia*, that members of the NYPD engaged in policing motivated at least in part by discrimination against Arab, Palestinian, Pro-Palestinian, and Muslim protestors protesting in support of Palestine; that members of the NYPD kettled, violently assaulted, and falsely arrested protestors as a

---

[29] *See,* e.g., Callaghan v. City of New York, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[30] *See* People of the State of New York v. City of New York et al., 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

pretext to disrupt and ultimately end the protest).

b. *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c. *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d. *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." See also *Larsen v. City of New York, et al*., 04-cv-0665 (RWS) (S.D.N.Y.);

e. *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as using extremely tight plastic handcuffs in their arrest;

f. *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04- cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5

(S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims); which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions; and *Packard et al v. City of New York*, 15-cv-7130 (SDNY(AT)(SDA) that settled for a total payout including attorney fees of $980,000, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions.

g.  *Callaghan v. City of New York*, 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading Monell claims virtually identical to the core Monell claims pleaded herein));

h.  *Osterhoudt v. City of New York, et al*., No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss Monell claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.  Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible," there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al*., 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and

docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco*, 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.  In *Peat v. City of New York*, No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk, encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.  Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, were settled on the eve of trial for substantial sums: *Packard v. City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York*, 14-cv-9148 (S.D.N.Y.) (AT);

l.  The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including Monell claims with much in common with many of those raised herein. See *Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.  The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC,* 13-cv-(RWS); *Crisp v. NYC*, 12-cv-5482(RWS); *Dedrick v. NYC,* 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.  Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well as several other OWS-related cases, included failure to train Monell claims concerning protest activity that are similar to the Monell claims in this litigation;

o.   The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled Arresting Protest, published April 2003, available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.   The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled Rights and Wrongs at the RNC, published in 2005, available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q.   The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street, published July 25, 2015, available at http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.   *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including Monell allegations challenging many of the same policies and practices herein, see, e.g., First Amended Complaint at Paragraph 415).

s.   *Sow v. City of New York*, 21-cv-533; *Sierra v. City of New York*, 20-cv-10291; and the rest of the *In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924 consolidated docket, certifying two classes covering 19 protests during the summer of 2020 for false arrest and excessive force claims, and entering a Consent Decree related to excessive force, false arrest, and unnecessary escalation at protests by NYPD.

**THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING**

149.   Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

150.   In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

24

151.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

152.    Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

153.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

154.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

155.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of Plaintiffs in this case.

156.    Upon information and belief, Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

157.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

158.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the

Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

159.     Defendants' failures to train, which led to violations of Plaintiffs' rights in this case, include, *inter alia,* the following:

a.    The failure to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

b.    The failure to make clear the need for individualized probable cause to arrest in a protest context;

c.    The use of VTL § 1156A exclusively against protesters as a pretext to arrest people for engaging in disfavored speech;

d.    The failure to train and/or allowing supervising officers to engage in protest policing designed to or with the effect of escalating protests, rather than de-escalating and facilitating First Amendment activity;

e.    The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

f.    The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters;

g.    The failure to provide training on the proper application and removal of flex-cuffs, including how to measure the appropriate tension on flex cuffs; how to assess the need to remove flex-cuffs; how long flex-cuffs may be worn before a significant risk of nerve damage develops; the safest types of flex-cuffs to use (for example, flex-cuffs with a double-locking feature and padding); the safest types of removal equipment to use and how to use removal equipment properly so as not to accidentally tighten flex-cuffs further in the process of removal; and other topics related to the use of flex-cuffs; and

h.    The failure to train on the importance of wearing the correct helmets with appropriate helmet numbers and not covering shield numbers.

160.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

161.    The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

162.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

163.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[31]

164.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

165.    Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous

---

[31] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns*, Gothamist, Jan. 30, 2015, *available at* https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.

lawsuits.[32]

166.    SRG members are meant to have additional DCU training.

167.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

168.    However, many of the officers deployed to respond to the protests in 2020 did not even receive that training, which was supposedly required of them.

169.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[33]

170.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

171.    Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

---

[32] Ali Winston, *NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct* Histories, The Appeal, Oct. 15, 2020, *available at* https://theappeal.org/nypd-srg-misconduct/.
[33] OCC Report at 37.

172.    For example, in a March 17, 2006 New York Times article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY).[34]

173.    Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

174.    After the 2002 WEF after-action reports were disclosed in Allen and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

175.    For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after-action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

176.    Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go

---

[34] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

177.    Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

178.    For example, in a deposition in *Packard v. City of New York*, 15-cv-7130 (S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

179.    As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

180.    For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b)(6) witness designated to testify on sidewalk policy protesting, dispersal orders, and training on probable cause standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training.

181.    Relatedly, according to the Corporation Counsel, "the NYPD does not

demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[35]

182.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiffs and other similarly injured protesters.

183.    Finally, upon information and belief, under the guise of combatting antisemitism, members of the NYPD have received protest training that is Islamophobic, Anti-Arab, and anti-Palestinian. Through this training, members of the NYPD are taught that symbols of Palestinian and Arab identity are anti-semitic, and that they should prosecute them accordingly.[36]

### THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS

184.    Defendants used types and levels of force that were excessive and unnecessary force against Plaintiff.

185.    The uses of force against Plaintiffs were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

186.    However, that use of force was consistent with and ratified within the unwritten policies of the NYPD.

---

[35] OCC Report at 2, 30.

[36] Alex Kane, "Training for NYPD Officers Categorized the Keffiyeh and Watermelon as Antisemitic Symbols," Jewish Currents, Apr 24, 2025, available at https://jewishcurrents.org/training-nypd-keffiyeh-watermelon-antisemitism-israel-palestine.

31

187.    In "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," an October 1, 2015 report published by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG-NYPD")[37], the OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies, including, *inter alia*, that:

    a.    NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

    b.    NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

    c.    NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

    d.    NYPD training does not adequately focus on de-escalation; and

    e.    In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force. OIG-NYPD Report at pp. 3-5.

188.    After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents". *See* OIG- NYPD Report at p. 2 *et seq*.; *see also* NYPD Patrol Guide Section 221-01[38] ("Force Guidelines") and 221-02[39] ("Use of Force"), issued and effective June 27, 2016 (implementing

---

[37] "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed April 1, 2022).

[38] Available online via the New York City Civilian Complaint Review Board ("CCRB") website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.

[39] Available online via the New York City Civilian Complaint Review Board website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.

changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

189.     Under those revised NYPD written policies and procedures, NYPD members who use force are required to file written Threat, Resistance, and Injury ("TRI") reports when they use certain force, including, but not limited to, hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), and/or force that causes physical injuries, including bruising or swelling and the like. And supervisors are also required to conduct investigations and fill out TRI reports related to such uses of force.[40]

190.     Upon information and belief, Defendants failed to document, and/or require that fellow Defendants and/or other fellow NYPD members document and failed to investigate and/or supervise fellow NYPD members regarding, uses of force in accordance with related NYPD policies and/or training.

191.     Defendants used force that they knew, or should have known, would negatively impact Plaintiff, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

**Defendants' Policies and Practices
Regarding Arrests—Including Mass Arrests—Without Fair Warning**

192.     In many cases, Defendants seized Plaintiffs based on the perception that they were part of a perceived group, without having made an individualized determination that there

---

[40] "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed April 1, 2022) (footnotes omitted).

was probable cause to arrest the Plaintiff in question based on their own, individual conduct, as opposed to the perceived "group conduct."

193.    In many cases, Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

194.    Additionally, in many cases, Defendants enforced provisions of New York law against Plaintiffs and other perceived protesters without probable cause and/or without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

195.    For example, with respect to protesters who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested protester had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested protester had the state of mind required for such arrest.

196.    By way of further example, with respect to protesters who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested person had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

197.    Defendants enforced provisions of New York law against Plaintiffs that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with – for example, VTL § 1156(a), which involves walking along or upon a roadway when an adjacent and usable sidewalk is available – the equivalent of jaywalking, an everyday offense that

Defendants all but ignore in the City.

198. In many cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiffs and other perceived protesters, including by kettling, without first having given Plaintiffs and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

199. Plaintiffs mount an as-applied, First Amendment-based challenges to the application of NYC Administrative Code § 3-108; PL §§ 240.20(5) and/or 240.20(6); and/or VTL § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

**Defendants' Protest Arrest Processing Policies and Practices**

200. Beyond that, in many cases, Defendants arrested Plaintiffs for alleged offenses which New York Criminal Procedure Law § 150.20 required them to grant Plaintiffs summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

201. However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiffs and other arrestees in flex-cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest

processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

202.    Additionally, as a result, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiffs to flex-cuffing as well as unreasonably lengthy, onerous arrest processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

203.    In some cases, NYPD members destroyed and/or damaged property belonging members of the Class.

204.    In other cases, NYPD members seized and retained property from arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

205.    In still other cases, NYPD members seized and retained property without providing a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

**DEFENDANTS' IMPOSED RESTRICTIONS**

206.    Defendants (a) imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in falsely arresting Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, in subjecting Plaintiffs to Defendants' Protest Arrest Processing Policies, and

36

in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

207.    In addition to being retaliatory, the restrictions Plaintiffs complain of herein, which Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct that:

    a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

    b.    Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened; and/or

        208.

    c.    Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

    d.    Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

**NYPD'S VIOLENT RESPONSE TO POLICING PROTEST IN 2020**

209.    Protests against police violence erupted across the nation after the May 25, 2020 police killing of George Floyd, and there were loud demands for police accountability and support for the Black Lives Matter movement.

210.    For several months between May 2020 and January 2021, the NYPD engaged in a pattern and practice of using violence against protestors that was encouraged, sanctioned and

37

enforced by Defendant City and policymaking officials.

211.    On June 17, 18, and 22 of 2020, New York State Attorney General Letitia James held hearings about the New York City Police Department's Response to Demonstrations wherein she found police officers "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[41]

212.    The Department of Investigation ("DOI") also conducted its own investigation and issued a report in response to the NYPD's response to the racial justice protest. [42]

213.    The DOI's review of NYPD policies revealed that the NYPD did not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots.[43]

214.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity." [44]

215.    Just one example of many instances of excessive use of the police was highlighted by Human Rights Watch and SITU Research, [45] a 99-page report providing a detailed

---

[41] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020) https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf
[42] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf
[43] Id at 35.
[44] Id at 56.
[45] US: New York Police Planned Assault on Bronx Protesters **-** *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters#

account of the NYPD's response to the June 4 peaceful protest in Mott Haven—a low-income neighborhood populated mostly by minorities, that has experienced high levels of police brutality and ingrained systemic racism.[46]

216.    On June 4, 2020, thousands of police officers surrounded and trapped protesters in Mott Haven, employing a tactic known as "kettling." Officers then beat kettled protestors with their batons and used pepper spray on them before arresting over 250 peaceful protestors. This was the same tactic used in each protest attended by each Plaintiff named herein.

217.    Further reports and videos taken at that protest event show countless injuries sustained at the hands of law enforcement, including broken bones, sprained muscles and joints, and potential nerve damage due to overly tight zip ties.

218.    The HRW report further notes that, "Most of those injured did not receive any immediate medical care, as police arrested or obstructed volunteer medics in medical scrubs with red cross insignia. Dozens of people spent hours in detention with untreated wounds and their hands bound behind their backs."[47]

219.    Indeed, the NYPD has responded to protests by using unlawful force and false arrests as a matter of policy and practice and has done so on many occasions throughout the years as issues of police brutality rose to unconscionable levels.

220.    *The People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG); *Rolon et al. v. City of New York, et al.,* 21-cv-02548(CM); *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG) and *Gray, et al., v. City of New York, et al.,* 21-cv-06610

---

[46] **"Kettling" Protestors in the Bronx –** *Systemic Police Brutality and its Costs in the United States.* See https://www.hrw.org/sites/default/files/media_2020/10/us_mott%20haven0920_web.pdf
[47] **US: New York Police Planned Assault on Bronx Protesters -** *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters#

(CM)(GWG) resulted in a settlement promising substantial reforms to the NYPD's policing of first amendment activities including training, practices, and supervision.[48]

221.    Yet, even on the heels of a settlement promising sweeping changes to police tactics related to policing demonstrations arising from the use of excessive force and other abusive tactics during the Black Lives Matter protests in the summer of 2020 and in 2021,  the NYPD has continued to engage in actions related to policing pro-Palestine demonstrations such as the one at which Plaintiffs were arrested, violating Plaintiffs' constitutional and other rights.

222.    Indeed, NYPD's approach to pro-Palestine demonstrations has been particularly brutal, specifically because of its disagreement with the perceived message.

## **CLASS ACTION ALLEGATIONS**

223.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek to represent a certified Plaintiff class consisting of:

(a)  all persons who at the time the protest that took place on April 30, outside the encampment at CCNY (the "Protest"), had any claims alleged in this Complaint, including, but not limited to, a claim they were (these categories overlap in some ways):

1.    arrested;
2.    detained in any fashion, without custodial arrest;
3.    subjected to any force;
4.    faced any police action that might have or did have any chilling effect;
5.    were otherwise subjected to, without any limitation, any of the policies, practices, and customs alleged elsewhere in this complaint.

For the lack of ambiguity, this includes persons who were subjected to any conduct by employees, agents, or other actors associated with or acting on behalf of the City, whether that action was:

1.    as part of enforcement action directed at the Protest itself;
2.    because of physical proximity to the Protest;
3.    because of perceived association with the Protest;
4.    because  of  observation  of  the  Protest,  or  any  attempt  or  perceived

---

[48] https://www.nyclu.org/uploads/2023/09/1099-2_settlement_agreement.pdf

attempt to document NYPD conduct during the Protest in any fashion;

5. otherwise because of any connection whatsoever to the Protest;

224. Plaintiff Class Representatives raise claims that are common to those possessed by all members of the class who are too numerous to be practically joined as individuals in this lawsuit.

225. In addition, joinder is impractical because, upon information and belief, some members of the Class are not or will be not be aware of the fact that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Upon information and belief, many members of the class are or will be without the means to retain an attorney to represent them in a civil rights lawsuit.

226. The common questions of fact and law predominate over individual ones that may be dissimilar between class members, including whether there was probable cause for mass arrests, whether the degree of force used and the encirclement tactic used were constitutionally appropriate, whether the Class was denied its right to protest within sight and sound of its target, and so on.

227. These common questions of fact and law all flow from the same policies, enacted and implemented by the named and unnamed Defendants. The defendant municipality's city-wide policies, practices, and customs effectuated at the Protest were a result of a unitary scheme in which the Defendants violated the constitutional rights of Class Members. The Class Representatives and all Class Members were and will be victimized by these same retaliatory policies of arresting protestors without legal justification in violation of, *inter alia*, the First, Fourth and Fourteenth Amendments of the United States Constitution, and the New York State Constitution, and thus the foregoing common questions of law and fact greatly predominate over questions affecting only individual members, including legal and factual issues relating to

41

damages.

228.    Judicial efficiency and economy will be furthered by recognizing this as a class action.

229.    Class Representatives have no interests dissimilar from class members.

230.    The claims raised by Class Representatives are also typical of the legal claims possessed by the other class members, in that at the time the Class Representatives' constitutional rights were violated, they were engaging and/or attempting to engage in activities protected by the First Amendment or were simply observing or in the vicinity of such conduct as bystanders. The Class Representatives were the victims of the Defendants' policies or arresting, without individualized determinations of probable cause and indeed without probable cause in general, but were instead groups of individuals engaged in lawful political protest and/or mere observation of said protest. The Class Representatives were the victims of excessive and unreasonable force in the course of these unconstitutional arrests and, following their arrests, were detained under conditions that were unreasonable, inhumane, excessive and punitive, all in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

231.    The legal claims for which Class Representatives seek declaratory and injunctive relief are the same as or similar to those on which all members of the Class will rely, and the harms suffered by the Class Representatives are typical of the harms suffered by the class members.

232.    Class Representatives have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Class, and will fairly and adequately protect the interests of the Class.

42

233. Moreover, many Class Representatives and Class Members continue to regularly participate in Palestine-related protests, where the Defendants' unconstitutional policies, practices and/or customs are implemented, and therefore remain at high risk of being unconstitutionally harmed in the future pursuant to these policies, practices and customs as they wish to participate in future protests.

234. Class Representatives are adequate to serve in this role because they were arrested without legal justification, while attending or observing the Protest, their summonses or other charging instruments were later dismissed, and they were subjected to Defendants' Protest Arrest Processing Policies. Plaintiffs are also typical of the members of the Class. Like other members of the Class, Class Representatives were subject to arrests in violation of their First Amendment rights, excessive use of force, and unconditional conditions of confinement.

235. Class Representatives are represented by Cohen&Green P.L.L.C. ("C&G"); The Aboushi Law Firm PLLC ("Aboushi"), Gideon Orion Oliver ("Oliver"); Beldock Levine & Hoffman LLP; Leena Widdi; and Jessica Massimi.

236. Among other history, Plaintiffs state as follows:

237. C&G attorneys have litigated a number of class action and police suits, including, but not limited to: *Sow, et al. v. City of New York, et* al, 21-cv-00533 (S.D.N.Y.) (one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, largest settlement amount paid to protestors in US history); *Jones v. United States Postal Service*, 20-cv-6516 (S.D.N.Y.) (nationwide voting rights class action); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y.), *aff'd sub. nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters), *cert. denied Maguire v. Edrei*, 139 S. Ct. 2614 (2019)

(with Oliver)); *Gallagher v. N.Y. State. Bd. of Elections*, 20-cv-5504 (S.D.N.Y.) (New York State voting rights class action). *See also Yang v. N.Y. State Bd. of Elections*, 20-cv-3325 (S.D.N.Y.), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).

238.    BLH attorneys have litigated a number of class action lawsuits including, but not limited to: *Sow* (discussed above); *Floyd v. City of New York*, 08-cv-1034 (S.D.N.Y.) (currently in the remedial stages); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ("Aided by the capable hands of Jonathan C. Moore . . ., class counsel is undoubtedly qualified and experienced to conduct this litigation."); *MacNamara v. City of N.Y.*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011); *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests); *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City); and *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.). See also, *Syed v. City of New York*, 16-cv-04789 (S.D.N.Y.); *Elsayed v. City of New York et al.*, 18-cv-10566 (S.D.N.Y.).

239.    Oliver has over 16 years of experience litigating civil rights cases against the NYPD, including hundreds of cases challenging the City's policies, practices, and customs related to protest policing. Oliver has frequently co-counseled with BLH attorneys and C&G attorneys in litigation, including *Sow*. For example, in addition to litigating other 2004 RNC-related cases, Oliver was Of Counsel to Beldock, Levine & Hoffman attorneys at the summary judgment briefing stage of the *MacNamara* RNC 2004 class action litigation. Ever since, Oliver has always maintained a docket including at least dozens of Plaintiffs' protest-policing related cases. One such recent case was *Edrei* (with C&G).

240.     Tahanie Aboushi has 15 years of experience litigating challenging the NYPD's practice and policies that violate the constitution resulting in policy changes. For example, *Elsayed, v. The City of New York, et al.*, 12-CV-5967(S.D.N.Y.) first individual case challenging the NYPD's removal of religious head coverings during post arrest processing and *Elsayed, et al., v. The City of New York, et al.* 18-cv-10566 (S.D.N.Y) a class action challenging the NYPD's removal of religious head coverings as co-counsel with Beldock, Levine & Hoffman. Ms. Aboushi was lead counsel in *Rolon et al v. City of New York et al.,* 21-cv-02548  (S.D.N.Y) one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, resulting in a historic settlement with the NYPD addressing police response to first amendment activities.

241.     Plaintiffs' counsel's firms have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the Class or between the attorneys and members of the Class.

242.     A Damages Class should be certified pursuant to Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual Class Members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. A class-wide proceeding will generate common answers to these questions.

243.     An Injunctive Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

**<u>FIRST CLAIM FOR RELIEF</u>**

45

**Unlawful Seizure / False Arrest**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

244.   Plaintiffs incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

245.   Defendants' seizures of the Plaintiffs herein were done without any judicial warrant authorizing them to seize Plaintiffs, were unreasonable, and were done without privilege or lawful justification.

246.   Plaintiffs did not consent and were conscious of their confinement by Defendants

247.   Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiffs.

248.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

249.   The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

**Excessive Force**
*Pursuant to 42 U.S.C.§1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

250.   Plaintiffs incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

251.    Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

46

252.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

253.     The illegal conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### First Amendment
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

254.     Plaintiffs incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

255.     Defendants imposed restrictions on protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in unlawfully seizing Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, in subjecting Plaintiffs to Defendants' protest policing policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

256.     The Defendants' retaliatory restrictions Plaintiffs complain of herein imposed upon Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment in public were themselves regulations on Plaintiffs' protected conduct that:

    a.  Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or,

    b.  Were content-neutral but nonetheless lacked sufficiently narrow tailoring to serve a significant governmental interest in that the restrictions substantially burdened more

protected speech and/or conduct than was necessary to serve those interests, and/or failed to adequately provide alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened or limited; and/or

c.  Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.  Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

257.    As a result of the Defendants' acts and omissions, Plaintiffs were deprived of their federal, state, and/or other legal rights; caused bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused to expend costs and expenses; and/or otherwise was damaged and injured.

258.    The illegal conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### First Amendment Retaliation
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

259.    Plaintiffs incorporate by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

260.    Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

261.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

262.    Defendants engaged in the acts and omissions complained of herein in an effort to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

48

263.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

264.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of their First Amendment rights.

265.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

266.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiffs' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiffs.

267.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining and assaulting Plaintiffs subjected Plaintiffs to the violations of their First Amendment rights described elsewhere herein.

268.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

269.    The unlawful conduct of the Defendants was willful, malicious, oppressive,

and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Due Process
*Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the Fifth and Fourteenth Amendments to the United States Constitution*

270.    Plaintiffs incorporate by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

271.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

272.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those individual Defendants who ordered, effected, and otherwise participated in seizing Plaintiffs and subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

273.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

274.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution*

275.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

276.   Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiffs suffered liberty deprivations and other injuries.

277.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

278.   The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

### Malicious Prosecution
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution*

279.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

280.   Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiffs, including by supplying and creating false information to be included in police paperwork that was included in police paperwork and providing falsely sworn information in accusatory instruments.

281.    Defendants misrepresented and falsified evidence and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence.

282.    Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiffs.

283.    Defendants acted with malice in initiating criminal proceedings against Plaintiffs.

284.    Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiffs were favorably terminated.

285.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

286.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## EIGHTH CLAIM FOR RELIEF

**Equal Protection and Selective Enforcement**
*Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the Fourteenth Amendments to the United States Constitution*

287.    Plaintiffs incorporate by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

288.    As discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those individual Defendants who ordered, effected, and otherwise participated in detaining Plaintiffs thus subjected Plaintiffs to the above-described violations of

52

Plaintiffs' Equal Protection rights.[49]

289.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

290.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## NINTH CLAIM FOR RELIEF
### Municipal Liability
### Pursuant to 42 U.S.C §1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution

291.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

292.     The facts pleaded above describe the policies, practices, and customs Defendants subjected Plaintiffs to, including, but not limited to: uses of excessive force, and false arrests, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the Curfew Orders and other violations against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone

---

[49] *See* e.g. NYCLU *supra* note 20 "The continual pattern of NYPD aggression against pro-Palestine demonstrators raises important questions about the City's disparate treatment of speakers based on their message."; *See also* CAIR-NY *supra* note 19.

at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning; using flex-cuffs for protest-related arrests, while failing to supply officers with protective padding and adequate numbers of cutting tools to loosen or remove flex-cuffs, while and/or to ensure that such cutting tools are readily available when needed; failing to loosen or remove over-tight cuffs; and subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

293.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including,; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

294.    The policies and practices (informal or formal) challenged herein also include, without limitation:

   a. Charging, or arresting and charging with a different offense, people under VTL § 1156(a), despite the charge either literally or all but literally never being used except for people at protests, as part of a practice to have always-available pretextual cause to arrest people engaged in First Amendment Activity;

   b. Using excessively tight handcuffs as a means of punishing protesters for their speech; lacking available means to loosen or remove handcuffs; leaving tight handcuffs on for hours and only ever removing them at mass arrest processing locations; allowing a culture and de facto practice of disregarding both written policy and

        manufacturer/medical instructions that plastic cuffs must (1) only be used on non-resisting arrestees and (2) be removed immediately after complaints of tightness; and similar disregards for the seriousness of the risks that accompany zip-tie cuffs;

c.    Either officially sanctioning or allowing a culture to fester where command/"white-shirt" level officers attack and escalate, rather than facilitate and de-escalate, protests, and move in with maximum force, use batons to the head, punches, and other extreme uses of force routinely and for "fun"[50];

d.    Using mass arrests as a standard response to protests, arresting protesters for group-probable cause based arrests, and the like; and

e.    Failing/refusing to issue process on the street for specifically protest arrests;

295.    As a result of the Defendants' misconduct, Plaintiffs were deprived of liberty and property, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and was otherwise damaged and injured.

## TENTH CLAIM FOR RELIEF

### *42 U.S.C. § 1983 False Arrest and Deprivation of Freedom Claim Against the Individual Defendants*

296.    Plaintiffs incorporate by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

297.    The individual Defendants willfully and intentionally seized, searched, detained, and arrested Plaintiffs, and caused them to be imprisoned, without probable cause, and without a reasonable basis to believe such cause existed.

298.    Plaintiffs were not engaged in any unlawful, violent, or criminal conduct, nor was she engaged in any behavior or conduct which could reasonably be viewed as such nor a basis to justify their arrest.

299.    Regardless of the lack of sufficient legal cause, Plaintiffs were arrested and

---

[50] *See, e.g., Rodriguez v. City Of New York*, 21-cv-10815, ECF No. 107-1 (SDNY) (text messages from Captain Delgado, that the City fought to keep sealed, where he refers to assaulting protesters as "play," is told by a report to "kick their ass," and says "LETS HAVE FUN" referring to the Mott Haven protest). Upon information and belief, neither he nor the relevant report were disciplined.

detained in the Defendants' custody.

300. In so doing, the individual Defendants falsely arrested and imprisoned Plaintiffs, and thereby violated and aided and abetted in the violation of Plaintiffs' rights under the Fourth Amendment of the United States Constitution.

301. By reason thereof, the individual Defendants have violated 42 U.S.C §1983 and caused Plaintiffs to suffer the deprivation of their individual liberty, the loss of the rights conferred to them under the United States Constitution, physical injuries, and mental and emotional anguish.

## ELEVENTH CLAIM FOR RELIEF

### N.Y.C. Admin. C. §§8-801 *et seq.,* "Qualified Immunity Repeal" Claims Against All Defendants

302. Plaintiffs incorporate by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

303. The New York City Administrative Code §8-803 provides as follows in relevant part:

   a. "A covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable to the person aggrieved for legal or equitable relief or any other appropriate relief."

   b. "The employer of a covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable, based upon the conduct of such covered individual, to the person aggrieved for legal or equitable relief or any other appropriate relief."

   c. "A person aggrieved may make a claim pursuant to subdivision a of this section in a civil action in any court of competent jurisdiction by filing a complaint setting forth facts pertaining to the deprivation of any right created, granted or protected by section 8-802 and requesting such relief as such person aggrieved considers necessary to insure the full enjoyment of such right."

304.     Given the fact that a "covered individual" under §8-801 means "[any] employee of the police department," the individual Defendants are all considered covered individuals. §8-801.

305.     Plaintiffs and the Class are all "person[s] aggrieved" because they were (at minimum) "allegedly subjected to, or allegedly caused to be subjected to, the deprivation of a right created, granted, or protected by §8-802 by a covered individual even if the only injury allegedly suffered by such natural person is the deprivation of such right." *Id.*

306.     Defendant City is liable as an employer, as set out above.

307.     Defendants' uses of force against Plaintiffs were unjustified, unlawful, and objectively unreasonable, considering the facts and circumstances before the Defendants.

308.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs' federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise dam damaged and injured Plaintiffs.

309.     Further, it is not a defense to liability under §§8-801 *et seq.* that a covered individual has qualified immunity or any other substantially equivalent immunity.

310.     Thus, the Court should award both compensatory and punitive damages against all parties (including the City), an order restraining future conduct, and all reasonable fees and court expenses pursuant to §8-805 of the Administrative Code.

## TWELFTH CLAIM FOR RELIEF

### Violations of the New York State Constitution

311.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

312.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

313.     Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

314.     A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

315.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

316.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**THIRTEENTH CLAIM FOR RELIEF**

**Violations of New York State Common Law**
*Assault*

317.      Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

318.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities, clothed

58

with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

319. Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

320. Defendants did thereby inflict assault upon the Plaintiffs.

321. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

322. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
### *Battery*

323. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

324. The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

325. Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

326.    Defendants did thereby inflict battery upon the Plaintiffs.

327.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

328.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
*Conversion*

329.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

330.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

331.    Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiffs' personal property in derogation of Plaintiffs' rights.

332.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

333.    The unlawful conduct of the Defendants was willful, malicious, oppressive,

60

and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
*False Arrest, False Imprisonment, and Unreasonable Detention*

334.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

335.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

336.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement, and it was without their consent.

337.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

338.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
*Negligent Training and Supervision*

339.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

340.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

341.     Upon information and belief, the defendant municipalities supervised and trained the police officials described above.

342.     The acts and conduct of the police officials were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

343.     Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

344.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

345.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## EIGHTEENTH CLAIM FOR RELIEF

**Violations of New York State Common Law**

*Excessive Detention*

346.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

347.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

348.     Defendants deliberately detained protesters for excessive and unreasonably prolonged periods of time.

349.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

350.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them

## NINETEENTH CLAIM FOR RELIEF

**Violations of the Right to Record**
**New York Civil Rights Law § 79-P / N.Y.C. Admin Code § 14-189 *et seq.***

351.     Plaintiffs hereby reallege and incorporate by reference all of the preceding paragraphs as though they were fully set forth herein.

352.     Prior to their assault, battery, and arrest, certain plaintiffs were exercising their rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity and under the similar provisions of N.Y.C. Admin. C. § 14-189,

63

Right to Record Police Activities.

353.    In arresting plaintiffs, Defendants exceeded their authority because their conduct was inconsistent with New York Civil Rights Law § 79-P, N.Y.C. Admin. C. § 14-189, and the Federal Constitutional.

354.    Defendants violated New York Civil Rights Law § 79-P in that plaintiffs were while they "exercised or attempted to exercise the right established in subdivision two of this section to record a law enforcement activity and an officer acted to interfere with that person's recording of a law enforcement activity" in one of the specified ways.

355.    Defendants violated N.Y.C. Admin. C. § 14-189 for substantially the same reason.

356.    Defendants unlawfully arrested plaintiffs to deter them from exercising their right to record law enforcement activity.

357.    New York Civil Rights Law § 79-P and N.Y.C. Admin. C. § 14-189 create private rights of action that explicitly provides for punitive damages and injunctive relief, as well as mandatory attorneys' fees and expert fees.

358.    New York Civil Rights Law § 79-P and N.Y.C. Admin. C. § 14-189 define "record" and the related right in extremely broad terms.

359.    Specifically, the laws create rights of action to sue for any law enforcement interference with the right, including "attempting to prevent [a] person from recording law enforcement activity." New York Civil Rights Law § 79-P(3)(i); *see also*, *id* § (iv); and N.Y.C. Admin. C. § 14-189(c)

360.    Similarly, there is a cause of action where an officer — regardless of the fact of recording — engages in "commanding that the person cease recording law enforcement activity

when the person was nevertheless authorized under law to record, as happened here. New York Civil Rights Law § 79-P(3)(iii).

361.    Thus, the statutes create rights of action, and that right — like the similar First Amendment right — "do[] not depend on whether [a plaintiff's] attempt to videotape was frustrated" (Gericke v. Begin, 753 F.3d 1, 3 n.2 (1st Cir. 2014)), or for that matter, only intended to create the impression someone was recording.

362.    Defendants' actions and policies alike violate New York Civil Rights Law § 79-P and N.Y.C. Admin. C. § 14-189 such that all the remedies available thereunder are appropriate.

## JURY DEMAND

363.    Plaintiffs request a jury trial on all issues capable of being tried and determined by a jury pursuant to Fed. R. Civ. P. 38.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs demand judgment against the individual Defendants and the City of New York as follows:

 i.  Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

 ii.  Actual damages in an amount to be determined at trial against the City of New York, and punitive damages to be determined at trial pursuant to N.Y.C. Admin. C. § 8-805(1)(ii);

 iii.  An appropriate restraining orders or injunctions pursuant to N.Y.C. Admin. C. § 8-805(3), N.Y. Civ. R. L. § 79-P(3)(c), and N.Y.C. Admin. C. § 14-189(c)(3), and

 iv.  Appropriate additional injunctive relief as may be determined at trial;

 v.  Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. § 1988, N.Y.C. Admin. L. § 8-805(2), N.Y.C. Admin. C. § 14-189, N.Y. Civ. R. L. § 79-P, and New York common law;

 vi.  Expert costs and fees pursuant to N.Y.C. Admin. C. § 14-189(c)(4) and N.Y. Civ. R. L.

§ 79-P(3)(d);

vii.  Such other relief as the Court deems just and proper.

**[this space intentionally left blank]**

Dated: New York, New York
      May 7, 2026


**THE ABOUSHI LAW FIRM, PLLC**

          /s/

By: Tahanie A. Aboushi
4924 4th Avenue, 2nd floor
Brooklyn, NY 11220
Tahanie@aboushi.com


**COHEN&GREEN P.L.L.C.**

By:         /s/

J. Remy Green
Elena L. Cohen
Regina J. Yu

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
       remy@femmelaw.com
       regina@femmelaw.com

**MASSIMI LAW PLLC**
By:        /s/
Jessica Massimi

99 Wall Street, Suite 1264
New York, NY 10005
jessica.massimi@gmail.com
P: 646-241-9800
F: 212-202-4779

**LEENA MOHMOUD WIDDI**

          /s/

1825 Foster Ave, Ste 1K
Brooklyn, New York 11230
Tel: (929) 344-7611
Leenawiddi.esq@gmail.com


**GIDEON ORION OLIVER**

         /s/

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com


**BELDOCK LEVINE & HOFFMAN LLP**

By:        /s/
     David B. Rankin
     Luna Droubi

99 Park Ave., PH/26th Floor
New York, NY 10016
Tel: (212) 490-0400
Fax: (212) 277-5880